# DURA PHARMACEUTICALS, INC., ET AL. *v.* BROUDO ET AL.

No. 03–932.   Argued January 12, 2005—Decided April 19, 2005

BREYER, J., delivered the opinion for a unanimous Court.

*William F. Sullivan* argued the cause for petitioners. With him on the briefs were *Christopher H. McGrath* and *Tracey L. DeLange.*

*Deputy Solicitor General Hungar* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Acting Solicitor General Clement, Dan Himmelfarb, Jacob H. Stillman, Eric Summergrad,* and *Allan A. Capute.*

*Patrick J. Coughlin* argued the cause for respondents. With him on the brief were *Sanford Svetcov, Eric Alan Isaacson, Joseph D. Daley, Alan Schulman, Myron Moskovitz, Daniel S. Sommers,* and *Paul R. Hoeber.**

JUSTICE BREYER delivered the opinion of the Court.

A private plaintiff who claims securities fraud must prove that the defendant's fraud caused an economic loss. 109 Stat. 747, 15 U. S. C. § 78u–4(b)(4). We consider a Ninth Circuit holding that a plaintiff can satisfy this requirement—a requirement that courts call "loss causation"—simply by alleging in the complaint and subsequently establishing that "the price" of the security *"on the date of purchase* was inflated because of the misrepresentation." 339 F. 3d 933, 938 (2003) (internal quotation marks omitted). In our view, the Ninth Circuit is wrong, both in respect to what a plaintiff must prove and in respect to what the plaintiffs' complaint here must allege.

---

*Briefs of *amici curiae* urging reversal were filed for the American Institute of Certified Public Accountants by *Lawrence S. Robbins, Kathryn S. Zecca,* and *Richard I. Miller;* for Broadcom Corp. by *Kenneth R. Heitz, David Siegel,* and *Richard H. Zelichov;* for the Chamber of Commerce of the United States by *Neil M. Gorsuch* and *Robin S. Conrad;* for Merrill Lynch & Co., Inc., by *Stephen M. Shapiro, Timothy S. Bishop, Andrew L. Frey,* and *Kenneth S. Geller;* for the Securities Industry Association et al. by *Carter G. Phillips, Richard D. Bernstein,* and *Jacqueline G. Cooper;* for Technology Network by *John R. Reese* and *Dale E. Barnes, Jr.;* and for the Washington Legal Foundation by *Michael L. Kichline, David A. Kotler, Daniel J. Popeo,* and *Paul D. Kamenar.*

Briefs of *amici curiae* urging affirmance were filed for the New Jersey Dept. of Treasury et al. by *Melvyn I. Weiss;* for the City of New York Pension Funds et al. by *Jay W. Eisenhofer, Geoffrey C. Jarvis, Leonard J. Koerner, Peter H. Mixon, David L. Muir,* and *Christopher W. Waddell;* for the National Association of Shareholder and Consumer Attorneys et al. by *Kevin P. Roddy, Deborah M. Zuckerman,* and *Michael Schuster;* for the North American Securities Administrators Association, Inc., by *Mark J. Davis;* for the Regents of the University of California by *James E. Holst* and *Christopher M. Patti;* and for James J. Hayes by *Edward M. Selfe.*

I

Respondents are individuals who bought stock in Dura Pharmaceuticals, Inc., on the public securities market between April 15, 1997, and February 24, 1998. They have brought this securities fraud class action against Dura and some of its managers and directors (hereinafter Dura) in federal court. In respect to the question before us, their detailed amended (181 paragraph) complaint makes substantially the following allegations:

(1) Before and during the purchase period, Dura (or its officials) made false statements concerning both Dura's drug profits and future Food and Drug Administration (FDA) approval of a new asthmatic spray device. See, e. g., App. 45a, 55a, 89a.

(2) In respect to drug profits, Dura falsely claimed that it expected that its drug sales would prove profitable. See, e. g., id., at 66a–69a.

(3) In respect to the asthmatic spray device, Dura falsely claimed that it expected the FDA would soon grant its approval. See, e. g., id., at 89a–90a, 103a–104a.

(4) On the last day of the purchase period, February 24, 1998, Dura announced that its earnings would be lower than expected, principally due to slow drug sales. Id., at 51a.

(5) The next day Dura's shares lost almost half their value (falling from about $39 per share to about $21). Ibid.

(6) About eight months later (in November 1998), Dura announced that the FDA would not approve Dura's new asthmatic spray device. Id., at 110a.

(7) The next day Dura's share price temporarily fell but almost fully recovered within one week. Id., at 156a.

Most importantly, the complaint says the following (and nothing significantly more than the following) about

economic losses attributable to the spray device misstatement: *"In reliance on the integrity of the market, [the plaintiffs] . . . paid artificially inflated prices for Dura securities"* and the plaintiffs suffered *"damage[s]"* thereby. *Id.,* at 139a (emphasis added).

The District Court dismissed the complaint. In respect to the plaintiffs' drug-profitability claim, it held that the complaint failed adequately to allege an appropriate state of mind, *i. e.,* that defendants had acted knowingly, or the like. In respect to the plaintiffs' spray device claim, it held that the complaint failed adequately to allege "loss causation."

The Court of Appeals for the Ninth Circuit reversed. In the portion of the court's decision now before us—the portion that concerns the spray device claim—the Circuit held that the complaint adequately alleged "loss causation." The Circuit wrote that "plaintiffs establish loss causation if they have shown that the price *on the date of purchase* was inflated because of the misrepresentation." 339 F. 3d, at 938 (emphasis in original; internal quotation marks and citation omitted). It added that "the injury occurs at the time of the transaction." *Ibid.* Since the complaint pleaded "that the price at the time of purchase was overstated," and it sufficiently identified the cause, its allegations were legally sufficient. *Ibid.*

Because the Ninth Circuit's views about loss causation differ from those of other Circuits that have considered this issue, we granted Dura's petition for certiorari. Compare *ibid.* with, *e. g., Emergent Capital Investment Management, LLC* v. *Stonepath Group, Inc.,* 343 F. 3d 189, 198 (CA2 2003); *Semerenko* v. *Cendant Corp.,* 223 F. 3d 165, 185 (CA3 2000); *Robbins* v. *Koger Properties, Inc.,* 116 F. 3d 1441, 1447–1448 (CA11 1997); cf. *Bastian* v. *Petren Resources Corp.,* 892 F. 2d 680, 685 (CA7 1990). We now reverse.

## II

Private federal securities fraud actions are based upon federal securities statutes and their implementing regulations. Section 10(b) of the Securities Exchange Act of 1934 forbids (1) the "use or employ[ment] . . . of any . . . deceptive device," (2) "in connection with the purchase or sale of any security," and (3) "in contravention of" Securities and Exchange Commission "rules and regulations." 15 U. S. C. § 78j(b). Commission Rule 10b–5 forbids, among other things, the making of any "untrue statement of a material fact" or the omission of any material fact "necessary in order to make the statements made . . . not misleading." 17 CFR § 240.10b–5 (2004).

The courts have implied from these statutes and Rule a private damages action, which resembles, but is not identical to, common-law tort actions for deceit and misrepresentation. See, *e. g., Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723, 730, 744 (1975); *Ernst & Ernst* v. *Hochfelder,* 425 U. S. 185, 196 (1976). And Congress has imposed statutory requirements on that private action. *E. g.,* 15 U. S. C. § 78u–4(b)(4).

In cases involving publicly traded securities and purchases or sales in public securities markets, the action's basic elements include:

(1) *a material misrepresentation (or omission),* see *Basic Inc.* v. *Levinson,* 485 U. S. 224, 231–232 (1988);

(2) *scienter, i. e.,* a wrongful state of mind, see *Ernst & Ernst, supra,* at 197, 199;

(3) *a connection with the purchase or sale of a security,* see *Blue Chip Stamps, supra,* at 730–731;

(4) *reliance,* often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation," see *Basic, supra,* at 248–249 (nonconclusively presuming that the price of a publicly

traded share reflects a material misrepresentation and that plaintiffs have relied upon that misrepresentation as long as they would not have bought the share in its absence);

(5) *economic loss*, 15 U. S. C. § 78u–4(b)(4); and

(6) *"loss causation,"* i. e., a causal connection between the material misrepresentation and the loss, *ibid.;* cf. T. Hazen, Law of Securities Regulation §§ 12.11[1], [3] (5th ed. 2005).

Dura argues that the complaint's allegations are inadequate in respect to these last two elements.

## A

We begin with the Ninth Circuit's basic reason for finding the complaint adequate, namely, that at the end of the day plaintiffs need only "establish," i. e., prove, that "the price *on the date of purchase* was inflated because of the misrepresentation." 339 F. 3d, at 938 (internal quotation marks and citation omitted). In our view, this statement of the law is wrong. Normally, in cases such as this one (i. e., fraud-on-the-market cases), an inflated purchase price will not itself constitute or proximately cause the relevant economic loss.

For one thing, as a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value. Moreover, the logical link between the inflated share purchase price and any later economic loss is not invariably strong. Shares are normally purchased with an eye toward a later sale. But if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss. If the purchaser sells later after the truth makes its way into the marketplace, an initially inflated purchase price *might* mean a later loss. But that is far from inevitably so. When the

purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price. (The same is true in respect to a claim that a share's higher price is lower than it would otherwise have been—a claim we do not consider here.) Other things being equal, the longer the time between purchase and sale, the more likely that this is so, *i. e.*, the more likely that other factors caused the loss.

Given the tangle of factors affecting price, the most logic alone permits us to say is that the higher purchase price will *sometimes* play a role in bringing about a future loss. It may prove to be a necessary condition of any such loss, and in that sense one might say that the inflated purchase price suggests that the misrepresentation (using language the Ninth Circuit used) "touches upon" a later economic loss. *Ibid.* But, even if that is so, it is insufficient. To "touch upon" a loss is not to *cause* a loss, and it is the latter that the law requires. 15 U. S. C. § 78u–4(b)(4).

For another thing, the Ninth Circuit's holding lacks support in precedent. Judicially implied private securities fraud actions resemble in many (but not all) respects common-law deceit and misrepresentation actions. See *Blue Chip Stamps, supra,* at 744; see also L. Loss & J. Seligman, Fundamentals of Securities Regulation 910–918 (5th ed. 2004) (describing relationship to common-law deceit). The common law of deceit subjects a person who "fraudulently" makes a "misrepresentation" to liability "for pecuniary loss caused" to one who justifiably relies upon that misrepresentation. Restatement (Second) of Torts § 525, p. 55 (1976) (hereinafter Restatement of Torts); see also *Southern Development Co.* v. *Silva*, 125 U. S. 247, 250 (1888) (setting forth elements of fraudulent misrepresentation). And the common law has long insisted that a plaintiff in such a case show

not only that had he known the truth he would not have acted but also that he suffered actual economic loss. See, *e. g.*, *Pasley* v. *Freeman*, 3 T. R. 51, 65, 100 Eng. Rep. 450, 457 (1789) (if "no injury is occasioned by the lie, it is not actionable: but if it be attended with a damage, it then becomes the subject of an action"); *Freeman* v. *Venner*, 120 Mass. 424, 426 (1876) (a mortgagee cannot bring a tort action for damages stemming from a fraudulent note that a misrepresentation led him to execute unless and until the note has to be paid); see also M. Bigelow, Law of Torts 101 (8th ed. 1907) (damage "must already have been suffered before the bringing of the suit"); 2 T. Cooley, Law of Torts § 348, p. 551 (4th ed. 1932) (plaintiff must show that he "suffered damage" and that the "damage followed proximately the deception"); W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 110, p. 765 (5th ed. 1984) (hereinafter Prosser and Keeton) (plaintiff "must have suffered substantial damage," not simply nominal damages, before "the cause of action can arise").

Given the common-law roots of the securities fraud action (and the common-law requirement that a plaintiff show actual damages), it is not surprising that other Courts of Appeals have rejected the Ninth Circuit's "inflated purchase price" approach to proving causation and loss. See, *e. g.*, *Emergent Capital*, 343 F. 3d, at 198 (inflation of purchase price alone cannot satisfy loss causation); *Semerenko*, 223 F. 3d, at 185 (same); *Robbins*, 116 F. 3d, at 1448 (same); cf. *Bastian*, 892 F. 2d, at 685. Indeed, the Restatement of Torts, in setting forth the judicial consensus, says that a person who "misrepresents the financial condition of a corporation in order to sell its stock" becomes liable to a relying purchaser "for the loss" the purchaser sustains "when the facts . . . become generally known" and "as a result" share value "depreciate[s]." § 548A, Comment *b*, at 107. Treatise writers, too, have emphasized the need to prove proximate causation. Prosser and Keeton § 110, at 767 (losses do "not

afford any basis for recovery" if "brought about by business conditions or other factors").

We cannot reconcile the Ninth Circuit's "inflated purchase price" approach with these views of other courts. And the uniqueness of its perspective argues against the validity of its approach in a case like this one where we consider the contours of a judicially implied cause of action with roots in the common law.

Finally, the Ninth Circuit's approach overlooks an important securities law objective. The securities statutes seek to maintain public confidence in the marketplace. See *United States* v. *O'Hagan*, 521 U. S. 642, 658 (1997). They do so by deterring fraud, in part, through the availability of private securities fraud actions. *Randall* v. *Loftsgaarden*, 478 U. S. 647, 664 (1986). But the statutes make these latter actions available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause. Cf. *Basic*, 485 U. S., at 252 (White, J., joined by O'CONNOR, J., concurring in part and dissenting in part) ("[A]llowing recovery in the face of affirmative evidence of nonreliance—would effectively convert Rule 10b–5 into a scheme of investor's insurance. There is no support in the Securities Exchange Act, the Rule, or our cases for such a result" (internal quotation marks and citations omitted)).

The statutory provision at issue here and the paragraphs that precede it emphasize this last mentioned objective. Private Securities Litigation Reform Act of 1995, 109 Stat. 737. The statute insists that securities fraud complaints "specify" each misleading statement; that they set forth the facts "on which [a] belief" that a statement is misleading was "formed"; and that they "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U. S. C. §§ 78u–4(b)(1), (2). And the statute expressly imposes on plaintiffs "the burden of proving" that the defendant's misrepresentations

"caused the loss for which the plaintiff seeks to recover."
§ 78u–4(b)(4).

The statute thereby makes clear Congress' intent to permit private securities fraud actions for recovery where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss. By way of contrast, the Ninth Circuit's approach would allow recovery where a misrepresentation leads to an inflated purchase price but nonetheless does not proximately cause any economic loss. That is to say, it would permit recovery where these two traditional elements in fact are missing.

In sum, we find the Ninth Circuit's approach inconsistent with the law's requirement that a plaintiff prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss. We need not, and do not, consider other proximate cause or loss-related questions.

B

Our holding about plaintiffs' need to *prove* proximate causation and economic loss leads us also to conclude that the plaintiffs' complaint here failed adequately to *allege* these requirements. We concede that the Federal Rules of Civil Procedure require only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2). And we assume, at least for argument's sake, that neither the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss. But, even so, the "short and plain statement" must provide the defendant with "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley* v. *Gibson*, 355 U. S. 41, 47 (1957). The complaint before us fails this simple test.

As we have pointed out, the plaintiffs' lengthy complaint contains only one statement that we can fairly read as describing the loss caused by the defendants' "spray device"

misrepresentations.   That statement says that the plaintiffs "paid artificially inflated prices for Dura['s] securities" and suffered "damage[s]."   App. 139a.   The statement implies that the plaintiffs' loss consisted of the "artificially inflated" purchase "prices."   The complaint's failure to claim that Dura's share price fell significantly after the truth became known suggests that the plaintiffs considered the allegation of purchase price inflation alone sufficient.   The complaint contains nothing that suggests otherwise.

For reasons set forth in Part II–A, *supra*, however, the "artificially inflated purchase price" is not itself a relevant economic loss.   And the complaint nowhere else provides the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation concerning Dura's "spray device."

We concede that ordinary pleading rules are not meant to impose a great burden upon a plaintiff.   *Swierkiewicz* v. *Sorema N. A.,* 534 U. S. 506, 513–515 (2002).   But it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.   At the same time, allowing a plaintiff to forgo giving any indication of the economic loss and proximate cause that the plaintiff has in mind would bring about harm of the very sort the statutes seek to avoid.   Cf. H. R. Conf. Rep. No. 104–369, p. 31 (1995) (criticizing "abusive" practices including "the routine filing of lawsuits . . . with only [a] faint hope that the discovery process might lead eventually to some plausible cause of action").   It would permit a plaintiff "with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the [discovery] process will reveal relevant evidence." *Blue Chip Stamps,* 421 U. S., at 741.   Such a rule would tend to transform a private

securities action into a partial downside insurance policy. See H. R. Conf. Rep. No. 104–369, at 31; see also *Basic*, 485 U. S., at 252 (White, J., joined by O'CONNOR, J., concurring in part and dissenting in part).

For these reasons, we find the plaintiffs' complaint legally insufficient. We reverse the judgment of the Ninth Circuit, and we remand the case for further proceedings consistent with this opinion.

*It is so ordered.*